1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9            FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEPHAN STOWERS

11            Petitioner,              No. CIV S-05-2067 MCE GGH P

12        vs.

13   MIKE EVANS, et al.,

14            Respondents.         FINDINGS AND RECOMMENDATIONS

15   _____/

16   *Introduction and Summary*

17            Petitioner was convicted of first degree murder and of personally using a firearm

18   in the commission of that murder.  He was sentenced to 25 years to life on the murder charge and

19   a 10 year consecutive sentence for use of the firearm.  After a close review of the claims, the

20   undersigned recommends that the petition be denied.

21   *Issues*

22            A threshold procedural issue exists concerning whether an evidentiary hearing

23   should be granted for any substantive claim.  The substantive claims are:

24   1.  Lack of a cautionary instruction for accomplice testimony (both due process and ineffective

25   assistance of counsel);

26   2.  Lack of a cautionary instruction regarding an in-custody informant witness (both due process

1

1   and ineffective assistance of counsel);

2   3.   Failure of counsel to adduce, and the trial court to permit development of, exculpatory

3   testimony;

4   4.   Failure of appellate counsel to seek review with the state supreme court.

5   *Facts*

6          The facts set forth by the Court of Appeal accurately set the backdrop for

7   resolution of the issues herein:

8          On April 14, 1996, Sacramento Police Officer Christina Mortenson
          and her partner, Officer Crosby, were dispatched to Freeport
9          Boulevard regarding a possible dead body on the road.  The
          officers arrived at approximately 4:00 a.m.  They found a body
10         lying just off the east shoulder.  The body had no pulse, exhibited
          no signs of life, and was pronounced dead at 4:13 a.m.

11

12         Around 5:00 a.m., Sacramento Police Detective John Cabrera, a
          homicide investigator, inspected the body and found on her person
13         an identification card in the name of Christine Cooper of Las
          Vegas, Nevada.  Also on the body were receipts in that name for an
14         airline flight scheduled to depart Las Vegas at 1:43 a.m. and to
          arrive in Sacramento at 2:59 a.m.  Also found were a Bank of
15         America access card in the name of Pamelya M. Anderson
          (defendant's mother) and a little over $100 cash.  Detective Cabrera
16         traveled to Las Vegas and located Anderson, who identified the
          victim as Lakisha Montue.  An autopsy identified the cause of
17         death as two gunshot wounds to the head.  Recovered bullet
          fragments were consistent with that of a .22-caliber bullet.
18         Montue had known Anderson for approximately 10 years and was
          "like a daughter" to her.  When Montue was 14 or 15 years old, she
19         had developed a relationship with defendant, who is Anderson's
          son.  After the relationship ended, defendant and Montue remained
          friends "[a]s close as a brother and sister."
20

21         In 1995, at age 19, Montue had been seriously injured in an
          automobile accident.  As part of an insurance settlement, Montue
22         received $75,000 cash and 360 monthly payments of $2,976.53
          each; Montue's son, who sustained minor injuries, received
          $30,000. FN3
23

24                 FN3.  Montue's 17 month old daughter was killed in
                  the accident.

25         In January 1996, Montue began living with Anderson.  In February
          1996, Montue executed a general power of attorney in favor of
26         Anderson.  Montue also gave Anderson guardianship of her son

2

and designated Anderson as the sole beneficiary of herself and her son.  By April 1996, the monthly payments from the insurance settlement were being deposited in a Bank of America account in Anderson's name.

About two weeks before the murder, Precious White, a friend of defendant, saw defendant and Montue fighting at a barbershop. White heard defendant tell Montue that he would shoot Montue. White told Sacramento Police Detective Toni Winfield that defendant had a .22-caliber gun, that he pointed it at Montue's head, and that he pulled the trigger two times while the gun was pointed at her head.

On April 12, 1996, defendant went to the La Quinta Inn, where his friend DeAndre Patterson worked, picked up Patterson, and took him to defendant's house.  During the drive, defendant asked Patterson to prove his friendship by helping him kill Montue. Defendant told Patterson that he wanted to kill Montue because she "was broke" and she "was trying to have him killed."

At some point that night, defendant told Patterson that his plan was to pick up Montue from the airport following her flight from Las Vegas; that Patterson would drive, and Montue would sit next to Patterson, while defendant sat in the back seat; that as Patterson approached the Norwood off-ramp-close to a golf course-he would pretend there was something wrong with the car; that Patterson would pull over; that defendant and Montue would get out of the car; that defendant would take Montue to a drainage ditch; and that he would shoot her.

Defendant told Patterson that he had to use a .22-caliber gun because that was what hit men used, it leaves little evidence, and it is one of the most common guns used to kill.  At the time, defendant possessed a .22-caliber rifle and a .38-caliber handgun. The rifle was kept at an apartment in the downtown area.

After discussing the plan, defendant received a telephone call and told Patterson that the murder was not going to happen that night. Defendant then took Patterson home.

The next day, April 13, 1996, defendant telephoned Patterson and told him that he needed to talk to him and would pick him up from work. When Patterson got off work, defendant came by the inn with Precious White (the friend who had witnessed the fight between defendant and Montue at the barbershop). While standing at the door of the inn, defendant told Patterson that the murder would happen that night and that he needed Patterson to help him. Defendant, Patterson, and White then left the inn and went to defendant's house.

\\\\\

3

The trio then proceeded to an apartment complex in downtown Sacramento where defendant jumped over a fence and returned with a rifle case. The trio next returned to defendant's house. Defendant and Patterson proceeded into the garage where defendant opened the rifle case and displayed a .22-caliber rifle. Later that evening, defendant obtained ammunition that he kept in his kitchen. He told Patterson that Montue was arriving "late that night" before 3:00 a .m. Patterson decided to excuse himself and asked defendant to take him home, which defendant did.

At approximately 4:00 a.m. on April 14, the police found Montue's body lying on the east shoulder of Freeport Boulevard in Sacramento County.

People v. Stowers, 2003 WL 535367 (Cal. App. 2003).

*Discussion*

    A.  Legal Standards

        The AEDPA legal standards are well known and will not be set out here at length, see generally, Clark v. Murphy, 331 F.3d 1062, 1067-1069 (9th Cir. 2003), but will be discussed only as necessary in the discussion of the substantive claims. The Supreme Court has recently opined on the standards for granting an evidentiary hearing in Schriro v. Landrigan, __U.S.__, 127 S.Ct. 1933, 1939-1940 (2007), which of course must be applied by all federal courts.

        Schriro first described the familiar test for granting an evidentiary hearing: that if the factual allegations were to be proved, petitioner would be entitled to relief. However, in determining whether relief could be granted, the federal court must apply the AEDPA deferential standards to legal and factual questions necessarily reached by the state courts. Id. Thus, for example, if the reasons for counsel actions were at issue, but under deferential standards, the court could not find prejudice, no evidentiary hearing would be necessary. Similarly, if the state court had made factual findings on the issue at bar, no evidentiary hearing could be held unless petitioner's proffer would constitute clear and convincing evidence. Importantly, petitioner must have attempted to have developed in the state courts the facts he desires to present in federal court. Id. at footnote 1. In addition, if the record refuted the applicant's allegations, i.e., petitioner was making allegations at odds with the established facts of the record, he would not

4

be permitted an evidentiary hearing unless such new facts would clearly and convincingly rebut the record.  Generally phrased allegations, or the failure to submit a proffer of available, specific proof will not clearly and convincingly rebut the record.

The last requirement is especially in play for one of petitioner's allegations herein. In Claim 3, petitioner refers generally to exculpatory evidence to be presented by a specific witness which, if believed, might have cast some doubt on petitioner's participation in the murder.  However, not only did petitioner fail to adduce any statements, declarations or the like by this alleged, exculpatory witness in state court (which is expressly required by state law), he failed as well in federal court to do the same.  Petitioner is not entitled to an evidentiary hearing in federal court when he fails to proffer with his request  the meaningful, *and presumably available to petitioner*, evidence with his request – especially after having been called on this defect in state court.

B.  <u>The Lack of an Accomplice Instruction</u>

Petitioner believes an error was committed when no cautionary instruction was requested or given notwithstanding a request regarding Patterson's testimony to petitioner's actions.  California law provides that accomplice testimony alone is insufficient for conviction, Cal. Penal Code § 1111,  and a commonly given jury instruction, CALJIC 3.18 provides that the testimony of an accomplice should be viewed with caution.

The first issue to be dealt with is petitioner's erroneous characterization of the issue herein.  Try as he might, petitioner cannot stretch the failure to give a cautionary accomplice testimony instruction into an issue described as relieving the prosecution of an element of its burden of proof.  The reason for petitioner's stretching is clear – an instruction which relieves the prosecution of its burden of proof beyond a reasonable doubt is on the gold standard of reversible habeas errors.  This is so even if California law provides that evidence is insufficient as a matter of law if the prosecution relies only on accomplice testimony to prove its case.  Insufficiency of the evidence is a different issue than instructing the jury, either expressly

1   or impliedly, that an element of first degree murder does not have to be shown beyond a

2   reasonable doubt.  Accordingly, the issue here, properly phrased, is whether the failure of counsel

3   to ask for, or for the trial court to give a cautionary instruction notwithstanding, constitutes

4   ineffective assistance of counsel or general due process error respectively.

5        Taking the latter issue first, petitioner cannot fault the trial court under federal law

6   in not giving a sua sponte accomplice instruction.  One does not have a federal due process right

7   to a cautionary accomplice instruction.  It is elementary to federal habeas corpus jurisprudence

8   that relief will not lie for alleged errors of state law in conducting a trial.  Estelle v. McGuire, 502

9   U.S. 62, 71-72, 112 S.Ct. 475 (1991).  Only if the alleged state law error encompasses an

10  established federal right of fundamental importance can relief be given.  Id.  As respondent

11  points out, federal law does not require evidence beyond that given by an accomplice to sustain a

12  conviction.  United States v. Necoechea, 986 F.2d 1273, 1282 (9th Cir. 1993).  See also United

13  States v. Fritts, 505 F.2d 168 (9th Cir. 1974).  It follows, therefore, that a conviction obtained in

14  state court primarily or only on accomplice testimony cannot be challenged as a "federal error."

15  It further follows that a cautionary instruction regarding an accomplice's testimony cannot be a

16  fundamental due process requirement.  Fritts, 505 F.2d at 169.

17       Ineffective assistance of counsel under the Sixth Amendment can, however, be

18  concerned with errors of state law which undermine confidence in the proceedings.  The specific

19  standards for maintaining an ineffective assistance claim are as follows:  The test for

20  demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466

21  U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show that, considering all the

22  circumstances, counsel's performance fell below an objective standard of reasonableness.

23  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must identify the acts

24  or omissions that are alleged not to have been the result of reasonable professional judgment.  Id.

25  at 690, 104 S. Ct. at 2066.  The federal court must then determine whether in light of all the

26  circumstances, the identified acts or omissions were outside the wide range of professional

1   competent assistance. <u>Id</u>., 104 S. Ct. at 2066. "We strongly presume that counsel's conduct was

2   within the wide range of reasonable assistance, and that he exercised acceptable professional

3   judgment in all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990)

4   (citing <u>Strickland</u> at 466 U.S. at 689, 104 S. Ct. at 2065).

5            Second, a petitioner must affirmatively prove prejudice. <u>Strickland</u>, 466 U.S. at

6   693, 104 S. Ct. at 2067. Prejudice is found where "there is a reasonable probability that, but for

7   counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id</u>. at

8   694, 104 S. Ct. at 2068. A reasonable probability is "a probability sufficient to undermine

9   confidence in the outcome." <u>Id</u>., 104 S. Ct. at 2068.

10           In extraordinary cases, ineffective assistance of counsel claims are evaluated

11  based on a fundamental fairness standard. <u>Williams v. Taylor</u> , 529 U.S. 362, 391-93, 120 S. Ct.

12  1495, 1512-13 (2000), (citing <u>Lockhart v. Fretwell</u>, 113 S. Ct. 838, 506 U.S. 364 (1993)).

13           The Supreme Court has recently emphasized the importance of giving deference

14  to trial counsel's decisions, especially in the AEDPA context:

15           In <u>Strickland</u> we said that "[j]udicial scrutiny of a counsel's
             performance must be highly deferential" and that "every effort
16           [must] be made to eliminate the distorting effects of hindsight, to
             reconstruct the circumstances of counsel's challenged conduct, and
17           to evaluate the conduct from counsel's perspective at the time."
             466 U.S., at 689, 104 S.Ct. 2052. Thus, even when a court is
18           presented with an ineffective-assistance claim not subject to §
             2254(d)(1) deference, a [petitioner] must overcome the
19           "presumption that, under the circumstances, the challenged action
             'might be considered sound trial strategy.'" <u>Ibid</u>. (quoting <u>Michel</u>
20           <u>v. Louisiana</u>, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

21           For [petitioner] to succeed, however, he must do more than show
             that he would have satisfied <u>Strickland's</u> test if his claim were
22           being analyzed in the first instance, because under § 2254(d)(1), it
             is not enough to convince a federal habeas court that, in its
23           independent judgment, the state-court decision applied <u>Strickland</u>
             incorrectly. <u>See Williams</u>, <u>supra</u>, at 411, 65 S. Ct. 363. Rather, he
24           must show that the [ ]Court of Appeals applied <u>Strickland</u> to the
             facts of his case in an objectively unreasonable manner.

25

26  <u>Bell v. Cone</u>, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

1        The standards for ineffective assistance of appellate counsel utilize the same

2  standards.  Smith v. Robbins, 528 U.S. 259, 285, 120 S.Ct. 746 (2000).

3        In this case, the Superior Court found that Patterson was *not* an accomplice.

4  However, this finding was not on the merits, but was rather in the nature of a default because

5  petitioner did not cite to the transcript where Patterson had testified that he assisted petitioner in

6  obtaining the murder weapon, and told petitioner to take off the scope because of light reflection

7  problems at night.  Lodged Document 3.  The trial court went on to say that if these things were

8  true, then Patterson was an accomplice.  The actual transcript at the places cited by petitioner

9  herein are unclear with respect to any material "help" petitioner rendered in obtaining the rifle,

10  but the transcript does demonstrate that Patterson gave advice to petitioner about the

11  disadvantages of the scope when utilized as a murder weapon at night.  RT 276-277.

12        Therefore, its appears unreasonable for trial counsel not to have at least attempted

13  to have the accomplice instruction read to the jury, as the downside of such is not apparent.

14        Nevertheless, the Superior Court, the last reasoned state court decision on the

15  issue[1], found that in light of the overall record, insufficient prejudice accrued to petitioner from

16  the lack of such an instruction.  The Superior Court found:

17        Other evidence corroborated "Lee Lee"'s testimony, that had
            merely outlined petitioner's plan to kill the victim and was not an

18        eyewitness account of the actual killing.  Petitioner had known the
            victim for many years and had a close relationship with her.

19        Petitioner had shown to have had motive to kill the victim, as the
            victim had received an insurance settlement and had designated

20        petitioner's mother as sole beneficiary of the settlement.  About
            two weeks before the murder, petitioner was overheard threatening

21        to shoot the victim, and pointed a .22 caliber gun at the victim's
            head, then pulled the trigger twice.  The victim's body was found

22        an hour after the time that "Lee Lee" claimed petitioner had
            planned to commit the murder.  The victim's temple had a bullet in

23        it, consistent with the earlier threat of a gunshot to the head that
            petitioner had been seen to make against her.  And later, petitioner

24

25        [1] Under AEDPA, the federal court looks through silent denials of higher state courts to
   the last reasoned (explicative) state court decision for application of deferential standards.

26  Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007) (en  banc).

1    confessed to the killing to an inmate in the local jail with whom
     petitioner had previously been acquainted.
2

3    Lodged Document 3.[2]

4           Moreover, as respondent points out, Patterson was subject to a vigorous cross-

5    examination in which the jury was told that Patterson was a three time felon, and various

6    inconsistencies in Patterson's post- crime statements to the police.  Finally, Patterson had to

7    acknowledge that even when he knew petitioner was serious about the murder, he did not call the

8    police and attempt to thwart it.  The jury had plenty of credibility matters to ponder when it

9    considered Patterson's testimony, and the fairly intuitive-in-any-event, accomplice instruction

10   may not have added all that much.  See Cool v. United States, 409 U.S. 100, 103, 93 S.Ct. 354

11   (1972) (recognizing the common sense quality of a cautionary accomplice jury instruction).

12          Petitioner makes an argument, perhaps necessarily in a conclusionary manner, that

13   the Superior Court got the prejudice issue wrong.  But that is a far cry from the error standard

14   under AEDPA.  Petitioner must show that the decision of the state court would be found

15   unreasonable by reviewing jurists, a standard even exceeding clear error.  Clark, supra.  It simply

16   is not possible to find that the Superior Court was unreasonable in the AEDPA sense in

17   determining that other evidence outweighed any prejudice that accrued from the lack of an

18   accomplice instruction.

19          Finally, petitioner's request for an evidentiary hearing is inapposite for this on-

20   the-record review of lack of prejudice.

21          The accomplice claim should be denied whether viewed as a due process issue, an

22   ineffective assistance of trial counsel issue, or as an ineffective assistance of appellate counsel

23   issue.

24   ───────────────

25         [2]  The court will comment later on the somewhat bootstrapish argument that the jail
     informant testimony supports the lack of an accomplice instruction, and the accomplice
26   testimony (Patterson) supports the lack of prejudice when viewing the failure to ask for a
     jailhouse  informant instruction.

1      C.  The Lack of a Jailhouse Informant Instruction

2             California law views the need for a credibility caution instruction as so important

3    that it mandates the giving of the cautionary instruction when a jailhouse "snitch" testifies

4    against the defendant.  Cal. Penal Code 1127a(b).[3]  However, there is no necessity to determine

5    whether a violation of a federal due process liberty interest occurs by the lack of giving this

6    instruction because the issue of prejudice or harm must be hurdled by petitioner.  This is so

7    whether a Brecht[4] substantial harm standard is used for due process error, or the "probability of a

8    different outcome" standard of ineffective assistance is used.  In reality, there is no meaningful,

9    analytical distinction between the two.

10            Cooper (apparently no relation to the Christine Cooper referenced in the facts),

11   who was acquainted with petitioner, testified to statements that petitioner made to Cooper, while

12   both were housed in the Sacramento County jail, concerning the murder herein.  The statements

13   on their face were quite damaging, to wit: "[Y]ou know I did it [the murder] and I know I did it,"

14   RT 616; that he (petitioner) was seeking Cooper or someone else to murder Patterson, the main

15   witness in the case, and would pay $10,000, RT 613; that petitioner desired him (Cooper) to

16   fabricate testimony, RT 616-617.

17            No informant instruction was requested , nor was one given *sua sponte* by the

18   court.  The undersigned cannot conceive of a tactical interest which would have persuaded

19   reasonable counsel not to seek the informant instruction.  The issue of prejudice (whether

---

21   [3]  "In any criminal trial or proceeding in which an in-custody informant testifies as a
witness, upon the request of a party, the court shall instruct the jury as follows:
'The testimony of an in-custody informant should be viewed with caution and
close scrutiny. In evaluating such testimony, you should consider the extent to
which it may have been influenced by the receipt of, or expectation of, any
benefits from the party calling that witness. This does not mean that you may
arbitrarily disregard such testimony, but you should give it the weight to which
you find it to be entitled in the light of all the evidence in the case.'

[4]  Brecht v. Abrahamson, 507 U.S. 619, 631, 113 S.Ct. 1710 (1993).

1   ineffective assistance or due process) is the issue upon which this claim will be decided.

2          The Superior Court again found lack of prejudice but this finding is a bit more

3   problematic.  In large part the evidence relied upon would have been that of witness Patterson for

4   whom no accomplice instruction was given.  As related in footnote 1, there is a bootstrapish

5   quality to relying on evidence which was not properly instructed upon for each of two witnesses.

6   That is, when the accomplice Patterson issue was being reviewed, the Superior Court relied on

7   Cooper, in part, and when the informant Cooper issue was being reviewed, the Superior Court

8   relied in part on Patterson.  Although petitioner does not make a cumulative prejudice argument,

9   the undersigned becomes wary of simply excusing every error when viewed singularly which had

10  some prejudice component to it; prejudice does add up after a time.  Killian v. Poole,  282 F.3d

11  1204 (9th Cir.2002).   Moreover, as noted above, the California legislature thought it quite

12  necessary to have the instruction given; there is almost a legislative prejudice presumption.

13         However, again, the need for a cautionary instruction is one born of common

14  sense, and jurors are not devoid of this quality.  This is especially so, as in this case, where the

15  jury was informed through testimony of Cooper's federal counsel that Cooper would be receiving

16  significant consideration at sentencing for his information given in petitioner's case.  Indeed, the

17  point was emphasized.  See e.g., RT 664-684.  Cooper was throughly questioned on the point of

18  his possible bias.   RT 625-644.  Cooper's prior felony convictions were also made known to the

19  jury.  RT 629.  Defense counsel and the prosecution emphasized the potential problems with

20  Cooper's testimony in final argument.  RT 793 (prosecution), RT 840 (defense): "Mr. Cooper, on

21  the other hand, has twenty years worth of reasons to lie, and you don't think he is going to do it?

22  Come on."  In essence, the evidence and argument all bespoke a need to question Cooper's

23  testimony.  The lack of a fairly self-evident jury instruction on the point did not make the

24  difference in this case between conviction and acquittal.

25         Again, the claim should be denied regardless of whether a liberty interest is

26  involved in the giving of the instruction, petitioner claims ineffective assistance of trial counsel,

1  or the claim involves the actions of appellate counsel.

2        C.  <u>Failure of Counsel to Adduce, and the Trial Court to Permit Exculpatory Testimony</u>

3        After trial,  petitioner claimed that his trial counsel was ineffective because he

4  failed to acquire the readily available exculpatory testimony that Wardell Hunter saw the victim,

5  moments before she was allegedly killed, in a car with two men; the car, a Ford Mustang 5.0, was

6  not a car that was owned by petitioner.  Hence, according to petitioner, the actual killers did not

7  include petitioner.  Petitioner based this assertion on an interview by a defense investigator.  As

8  was made known at the motion for new trial, the prosecution had received this defense report

9  from the defense; it was, therefore, obvious that defense trial counsel had knowledge of the

10  report as well.  The motion for new trial was denied on the grounds that the supposed

11  exculpatory evidence was not new evidence.[5]

12        The same claim was made later in the first state habeas petition.  The Superior

13  Court legitimately questioned the basis for this repeated claim in that even months after trial,

14  petitioner produced no statement from Hunter concerning this testimony – this was still just an

15  untested assertion rendered by petitioner.  Nor did petitioner attempt to present any evidence

16  from his trial counsel as to why this exculpatory evidence was not thought worthwhile.  The

17  Superior Court refused to find the investigator hearsay as a valid basis on which to grant the writ

18  of habeas corpus.

19        Despite the adverse results in the Superior Court, the same allegation is made

20  herein with the same hearsay.  The same lack of a direct statement from Hunter or trial counsel is

21  apparent.   Even if the evidence is exculpatory, and it is not on its face, <u>see</u> <u>below</u>, the writ could

22  not be granted here on the basis of the investigator hearsay.

23  \\\\\

---

25      [5]  Petitioner attempts to allege that he did not have sufficient time to develop this claim
   for the motion for new trial hearing.  However, the point of the denial of the claim was that
26  petitioner and his counsel had obtained knowledge of the alleged Hunter observation very early
   in the trial proceedings.

1    However, petitioner has requested an evidentiary hearing, and presumably would

2   attempt to introduce non-hearsay evidence, although petitioner gives no indication that such

3   evidence is available.   Under 28 U.S.C. §  2254(e)(1)(2), with exceptions not applicable here, <u>see</u>

4   <u>below</u>, a petitioner is not entitled to an evidentiary hearing in federal court for a claim which he

5   "failed to develop" in state court.   <u>Williams v. Taylor</u>, 529 U.S. 420, 120 S.Ct. 1479 (2000).   In

6   <u>Williams</u>, the Supreme Court found no evidentiary hearing appropriate for a <u>Brady</u> claim when

7   the medical report at issue had been available in files accessible to state habeas counsel.   <u>Id</u>. at

8   437-438, 120 S.Ct. at 1491.   Here, the Superior Court found that petitioner failed to develop the

9   claim he was making – and for good reason.   Clearly, the habeas petition could not be granted on

10   the basis of the investigator hearsay, especially after the trial court had already ruled that the

11   investigator report itself was not "new evidence."   Petitioner was on notice by the time of his

12   habeas filing that something besides the report, i.e., a declaration from Hunter at the very least,

13   needed to be produced.   The investigator report itself had all the earmarks of another petitioner

14   inspired testimony fabrication for which Hunter later got cold feet, and refused to participate

15   further.   At the very, very least, a declaration from trial counsel addressing the issue and why he

16   had not utilized such evidence should have been filed.   Thus, petitioner's failure to develop the

17   evidence by the time of the state habeas filing precludes its development here.

18    Moreover, under <u>Schiro</u>, <u>supra</u>, this court is authorized to decide the petition on

19   the record, as petitioner's rendition of "specific facts," when viewed in light of the entire record,

20   falls far short of establishing any colorable claim.   (<u>See</u> below).

21    There are three potential exceptions to the "failed to develop" forfeiture; however,

22   none of them apply.   The claim does not rely on a new rule of constitutional law made retroactive

23   to habeas cases by the Supreme Court.   § 2254(e)(2)(A)(i).   Nor is the alleged factual predicate

24   one that was unknown to petitioner until recently.   § 2254(e)(2)(A)(ii).   The investigator's report

25   was know to everyone early on in the trial proceedings.   Nor could the information relayed by the

26   investigator be "clear and convincing evidence" establishing "that no reasonable fact-finder

13

1  would have found the [petitioner] guilty of the underlying offense." § 2254(e)(2)(B).

2        As pointed out by respondent, even accepting the truth of the alleged Hunter "to-

3  be-testified-to" assertions, the fact that two men were in the car, unidentified, does not mean that

4  petitioner was not one of those men.  And, just because Patterson bowed out of the attempt does

5  not mean that petitioner did not make a last minute recruit of someone else to assist him.  Even

6  petitioner's non-ownership of the Mustang allegedly containing the victim an hour or so before

7  her death does not assist petitioner – as one of the statements made to Cooper by petitioner was a

8  request *by petitioner* to Cooper that *Cooper* testify for petitioner to the effect that Cooper saw

9  petitioner and Patterson on the night of the murder, a few hours before it occurred, and that they

10  had asked him to jump-start a "green 5.0."  RT 616-617.  When combined with Cooper's

11  testimony, the fact that Hunter was supposed to have seen a Mustang 5.0 associated with

12  petitioner paints a picture of petitioner's sloppily orchestrated fabrication attempts at different

13  times, and in any event is highly incriminatory (if the victim was seen in a non-owned Mustang

14  associated with petitioner just before her death).[6]

15        Petitioner is not entitled to an evidentiary hearing in federal court, and hence

16  cannot prove his claim.[7]  In light of the entire record, petitioner's claim should be denied.

17  \\\\\

18  \\\\\

---

19

20    [6] Hunter was supposed to have seen a "blue" Mustang at night, and Cooper was asked to testify about a "green" Mustang.  It is quite possible that petitioner had a difficult time with keeping up with all the details of the orchestration – to make them consistent, or sufficiently

21  distinct, so as to not throw the accusatory light back on himself.

22    [7] Petitioner finally argues that his trial counsel was ineffective for not seeking a

23  continuance of the trial such that his defense investigator could present the alleged exculpatory information at trial and that the state trial court violated due process at the new trial motion in not permitting the alleged exculpatory information to be further developed.  Both assertions are

24  frivolous.  The defense investigators recitation of what Hunter supposedly said to him was rank hearsay, and would not have been permitted at trial even if it was exculpatory, which for the

25  reasons set forth above, it was not.  The second assertion lacks any merit because petitioner did not produce a Hunter statement even months later at the time the state habeas petition was filed,

26  and *still to this day* has not produced such information.

14

D.  <u>Failure of Appellate Counsel to Seek Review With the State Supreme Court</u>

Petitioner claims at page 6 of the petition that his appellate counsel was ineffective for not seeking review with the California Supreme Court.  This claim has no merit as the United States Supreme Court has refused to recognize such a claim.  <u>Wainwright v. Torna</u>, 455 U.S. 586, 102 S.Ct. 1300 (1982).

Respondent views the claim as one alleging due process error in the state court collateral review stages.  Respondent viewed it as such because the briefing associated with this claim abandoned the stated claim and raised this other issue.  While such a newly argued claim does not raise a federal issue as respondent sets forth, that is not the claim presented by the petition itself.  In any event, because petitioner is not entitled by the federal Constitution to have any collateral review process, it follows that he cannot assert as a claim that the state habeas process was deficient.  <u>Gerlaugh v. Stewart</u>, 129 F.3d 1027, 1045 (9th Cir. 1997).

<i>Conclusion</i>

All of the petition's claims lack merit.  Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus should be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised

\\\\\

\\\\\

\\\\\

\\\\\

\\\\\

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: 05/12/08

                                            /s/ Gregory G. Hollows

4                                          _____

5                                           UNITED STATES MAGISTRATE JUDGE

    GGH:gh:035
6   stow2067.157

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                                            16